UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VICTOR J. CHAIN, JR., PETER HAYWARD,
GILBERT LEWIS, ANTHONY L. PLATONI, AND
OWEN TAYLOR on behalf of themselves and all
others similarly situated,

                Plaintiffs,

     -against-

NORTH EAST FREIGHTWAYS, INC. D/B/A
LAND AIR EXPRESS, LAX, LLC AND
LAND-AIR EXPRESS OF NEW ENGLAND, LTD.,

                Defendants.
------------------------------------------------------------X

**OPINION AND ORDER**

16 Civ. 3371 (JCM)

        Plaintiffs Victor J. Chain, Jr., Peter Hayward, Gilbert Lewis, Anthony L. Platoni and

Owen Taylor (collectively, "Plaintiffs") commenced this action pursuant to the federal Worker

Adjustment and Retraining Notification Act ("federal WARN Act"), the New York Worker

Adjustment and Retraining Notification Act ("New York WARN Act") (collectively, "WARN

Acts"), and the New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act ("New

Jersey WARN Act") on behalf of themselves and others similarly situated against Defendant

Land-Air Express of New England, Ltd. ("Land-Air"). (Docket No. 1).  Defendant Land-Air

failed to appear, and the Honorable Vincent L. Briccetti entered a default judgment against it.

(Docket No. 13).  Thereafter, Plaintiffs filed an Amended Complaint adding North East

Freightways, Inc. d/b/a Land Air Express ("NEF") and LAX, LLC ("LAX") on a theory of

successor liability. (Docket No. 30).  Discovery proceeded against NEF and LAX (collectively,

"Defendants").  The Court held a bench trial from July 20 to 24, 2020.[1]  Thereafter, the parties

---

[1] Plaintiffs and Defendants NEF and LAX consented to this Court's jurisdiction over all proceedings in this matter
pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 157).

submitted post-trial briefing. (Docket Nos. 245, 246).  Defendants also submitted a motion to

decertify Plaintiffs' proposed class. (Docket No. 239).  Plaintiffs opposed the decertification

motion, (Docket No. 247), and Defendants replied, (Docket No. 248).

After due deliberation, it is hereby ordered and adjudged that this Opinion and Order

constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52(a).  For the reasons that follow, the Court finds that Plaintiffs have not proven that

Defendants are liable under the WARN Acts and dismisses the action against Defendants NEF

and LAX.  Thus, the Court declines to reach the issue of decertification of the class.  The Court

further respectfully reports and recommends to the Honorable Vincent L. Briccetti that the

default judgment entered against Land-Air be vacated because it is inconsistent with the Court's

finding that there is no liability under the WARN Acts.[2]

## I.  STANDARD OF REVIEW

Rule 52(a) of the Federal Rules of Civil Procedure "provides, in relevant part, that a court

conducting a bench trial 'must find the facts specially and state its conclusions of law

separately,' and that '[j]udgment must be entered under Rule 58.'" *Viera v. United States*, No.

18-cv-9270 (KHP), 2020 WL 5879035, at *2 (S.D.N.Y. Oct. 1, 2020) (quoting Fed. R. Civ. P.

52(a)(1)).

---

[2] Notwithstanding the fact that Plaintiffs and the answering Defendants consented to the jurisdiction of the magistrate judge over this case pursuant to 28 U.S.C. § 636(c), (Docket No. 157), Land-Air, the defaulting party, has not consented to the jurisdiction of the magistrate judge.  Accordingly, the portion of the Opinion and Order regarding vacating the default judgment against Land-Air will be in the form of a Report and Recommendation to the Honorable Vincent L. Briccetti since he was the District Judge that entered the default judgment against Land-Air. (*See* Docket No. 13); *Laboratories Rivas, SRL v. Ugly & Beauty, Inc.*, No. 11 Civ. 5980(RA)(JLC), 2013 WL 5977440, at *1 n.1 (S.D.N.Y. Nov. 12, 2013), *report and recommendation adopted*, 2014 WL 112397 (S.D.N.Y. Jan. 8, 2014).

## II.  FINDINGS OF FACT

### A.  Procedural History

On May 6, 2016, Plaintiffs commenced this action against Land-Air seeking damages pursuant to the federal WARN Act, the New York WARN Act and the New Jersey WARN Act. (Docket No. 1).  On August 22, 2016, the Honorable Vincent L. Briccetti entered a default judgment against Land-Air for failing to answer or otherwise respond to the Complaint. (Docket No. 13).

On May 3, 2017, Plaintiffs filed an Amended Complaint naming NEF and LAX as Defendants. (Docket No. 30).  On August 13, 2018, the Court so-ordered a joint stipulation and consent order for class certification. (Docket No. 107).  Pursuant to the joint stipulation, the Court certified three subclasses comprised of employees located at Land-Air's terminals in Burlington, New Jersey, Carlstadt, New Jersey and Rock Tavern, New York. (*Id.*).  On September 10, 2018, the Court approved Plaintiffs' proposed class notice. (Docket No. 109).

Plaintiffs moved for summary judgment on February 5, 2019, (Docket No. 120), and Defendants filed a cross-motion for summary judgment, (Docket No. 126).  The Court issued a Bench Order on September 18, 2019 granting Defendants' motion for summary judgment relating to the New Jersey terminals, and denying Defendants' motion with respect to Plaintiffs' federal and New York WARN Acts claims.

A bench trial was held from July 20 to 24, 2020. (Trial Tr.[3] at 1-782).  Plaintiffs testified on behalf of themselves. (*Id.* at 226, 243, 250, 261).  William Spencer ("Spencer"), Dick Anagnost ("Anagnost") and Edward Baroody ("Baroody"), former and current owners of Land-Air, and/or NEF and LAX, as well as Jason Hemenway and Stacey Mabie ("Mabie"), former

---

[3] Refers to the transcript of the bench trial.

Land-Air managers, also testified. (*Id.* at 24, 138, 271, 516, 631).  The deposition testimony of

Phillip Palker ("Palker"), taken on June 5, 2018, was admitted into evidence. (*See* Trial Ex.[4]

241).  Additionally, Matthew Rigling testified regarding damages. (*Id*. at 747).

**B.  Factual Background[5]**

**1.  Rock Tavern's Temporary and Permanent Closures**

Spencer and his brother Thomas Spencer were co-owners of Land-Air, a regional freight

transportation and delivery company headquartered in Williston, Vermont. (Trial Ex. 261 ¶¶ 1-

2).  By 2015, Land-Air operated out of several terminals, one of which was in Rock Tavern, New

York.  In or around October 2015, the Federal Motor Carrier Safety Administration ("FMCSA")

conducted a safety inspection of Land-Air's terminals, which uncovered several violations by

Land-Air. (*Id.* ¶ 3).  As a result, on December 28, 2015, the FMCSA ordered Land-Air to

suspend its trucking operations. (*Id.* ¶ 4).  At that time, there were approximately 60 employees

working at the Rock Tavern terminal, *including* Mabie, then partner relations manager, (Trial Ex.

256 ¶ 12), and four truckload, or "mileage" drivers: Mark Gray ("Gray"), Alan Dash ("Dash"),

Javier Gonzalez ("Gonzalez") and Jimmy Tate ("Tate") (collectively, "mileage drivers") who

reported to a dispatcher in Boston, but worked under the Rock Tavern "heading,"[6] (Trial Tr. at

61, 201-02, 414; *see* Trial Exs. 256 ¶ 9, 258 ¶ 4, 260 ¶ 4).

The temporary shutdown was financially devastating to Land-Air; the company's

business decreased by two-thirds and it was delayed in meeting payroll for work performed by

employees during and immediately after the temporary shutdown. (*See* Trial Exs. 261 ¶ 6, 256 ¶¶

---

[4] Refers to the exhibits admitted at the bench trial.

[5] The findings of facts set forth herein are derived from the testimony and exhibits presented at trial.

[6] Dash, Gonzalez and Tate were "moved over" from the Burlington, New Jersey terminal after it closed in mid-January 2016 and "worked out of" the Rock Tavern terminal until January 29, 2016. (Trial Ex. 254 ¶ 25 n.1).

6-7; Trial Tr. at 288).  Ultimately, Land-Air's employees' paychecks were delayed by two

weeks.[7] (Trial Tr. at 48, 288; Trial Ex. 256 ¶¶ 8,19).  During the shutdown, Rock Tavern

employees received mixed messaging from management about the terminal's future and whether

payroll would be met. (*See* Trial Ex. 255 ¶ 8).  Donald Hemenway, Land-Air's operations

manager, "assured" and "re-assured" employees "that the Rock Tavern terminal would not be

shut down again." (Trial Exs. 257 ¶ 8, 259 ¶ 8).  On the other hand, Dennis Gregory

("Gregory"), then terminal manager, informed roughly 21 employees that it was "likely that

Land-Air may not reopen," and if it did, it "probably wouldn't be able to make payroll." (Trial

Ex. 256 ¶ 7).  Mabie also told employees that "they could return if they wanted, but that they

may not be paid for their work." (Trial Ex. 256 ¶ 11).

Approximately ten days after the shutdown, on January 8, 2016, Land-Air was permitted

to resume its trucking operations on a "conditional" basis and the Rock Tavern terminal

reopened. (Trial Tr. at 276; *see also* Trial Ex. 261 ¶ 5).  Mabie was promoted to terminal

manager. (Trial Ex. 256 ¶ 2).  When the terminal reopened, many of its employees did not return.

(*Id.* ¶ 16; Trial Tr. at 50).  Out of the approximately 60 employees working at the Rock Tavern

terminal at the time of the FMCSA shutdown, only about 30 employees returned to work when

the terminal resumed operations. (Trial Tr. at 50; *see also* Trial Ex. 256 ¶ 15).  The evidence

shows that four Land-Air employees did not return to work specifically because "they were

worried they were not going to get paid and/or they believed the facility was going to

permanently close." (Trial Exs. 257 ¶ 11, 259 ¶ 12, 260 ¶ 9).  Additionally, the record

---

[7] The record is inconsistent with respect to how many payrolls Land-Air employees missed as a result of the
FMCSA shutdown.  The payroll records indicate that Land-Air employees were paid on a weekly basis. (*See* Trial
Ex. J).  Mabie testified that payroll "was about 2-3 weeks late," (Trial Ex. 256 ¶ 8), meaning Land-Air missed 2-3
payrolls, while Spencer testified that "there was one entire pay period that was delayed," (Trial Tr. at 288),
suggesting that only one payroll was missed.  Hemenway testified that the employees missed 2 payrolls. (*Id.* at 82).
The Court credits the employees' testimony that their paychecks were delayed by two weeks.

demonstrates that Gregory left during the shutdown "because he wasn't being paid." (Trial Ex. 256 ¶ 10).  The record is devoid of evidence as to why the rest of the employees did not return.

On January 13, 2016, Land-Air executed a loan agreement ("Loan Agreement") with Anagnost Investments, Inc. ("Anagnost Investments") pursuant to which it received a loan for $551,657.84. (Trial Tr. at 288, 532; Trial Ex. 261 ¶ 14).  Spencer used the entirety of the loan to meet payroll. (Trial Tr. at 288).  Nonetheless, some Rock Tavern employees left between the terminal's conditional reopening on January 8, 2016 and when it closed permanently on January 29, 2016. (Trial Ex. 256 ¶ 16).  There is no evidence in the record as to why these employees left Land-Air. (*Id.*; Trial Tr. at 49).

During and after the FMCSA shutdown, until approximately January 25, 2016, Spencer attempted to keep the Rock Tavern terminal open. (Trial Tr. at 349-50).  However, at some point between January 17, 2016 and January 25, 2016, the Rock Tavern terminal lost its second largest customer, Pitt Ohio Express, which Spencer determined "would be crushing to the existence of the [Rock Tavern] facility." (*Id.* at 350-51).  In or around January 25, 2016, Spencer decided to close the Rock Tavern terminal due to the loss of Pitt Ohio Express and other major customers, the financial condition of Land-Air, and the fact that "most employees had quit." (*Id.* at 389-90, 405).  Around this time, the mileage drivers were hired by NEF, following Spencer's decision in early January to shut down Land-Air's truckload division to cut costs. (*Id.* at 101, 414; Trial Ex. 153).  It is unclear exactly when each mileage driver left NEF's employ. (*See* Trial Tr. at 202-03).

On approximately January 26 or 27, 2016, Spencer informed Mabie that the Rock Tavern terminal would close on January 29, 2016. (Trial Ex. 256 ¶ 20).  Shortly thereafter, Mabie was told by Donald Hemenway that she "was not allowed to inform other employees about the

imminent closure." (*Id.*).  On January 29, 2016, the Rock Tavern terminal closed permanently. (Trial Ex. 261 ¶ 7).

In total, approximately 33[8] employees had not returned to the Rock Tavern terminal after the FMCSA shutdown or departed prior to its permanent closure on January 29, 2016. (Trial Tr. at 201-02; Docket Nos. 240 at 13, 245 at 14 n.8).  Land-Air officially terminated 22 employees on January 29, 2016, the day of the shutdown. (Trial Tr. at 194).  The employees who were terminated were informed of the Rock Tavern terminal's closure that day. (Trial Tr. at 277-78). Plaintiffs were among those employed at the Rock Tavern until January 29, 2016. (Trial Exs. 257 ¶ 10, 258 ¶ 10, 259 ¶ 11, 260 ¶ 8).  After the closure of the Rock Tavern terminal, Mabie remained employed by Land-Air until May 2016. (Trial Tr. at 467).  She returned to her previous position as partner relations manager. (*Id.*).

**2. Land-Air's Relationship to NEF**

NEF is a freight delivery company based in Manchester, New Hampshire. (Docket No. 30 ¶ 13).  In 2016, Palker, Palker's wife, Anagnost and Baroody were the co-owners of NEF, (Trial Ex. 241 at 21), with Palker serving as the company's president, (*id.*).  During this time, Palker and Spencer were friends and former co-workers. (Trial Ex. 261 ¶ 10).  LAX is a subsidiary of NEF that was formed on January 28, 2016 to run a shipping business under the Land-Air name. (*See* Trial Ex. 241 at 171).

In early January 2016, because of the financial difficulties Land-Air faced after the FMCSA investigations and temporary shutdown, Palker reached out to Spencer to offer his

---

[8] The parties agree that 60 employees, including Mabie and the mileage drivers, were employed at the Rock Tavern terminal in December 2015. (Trial Tr. at 201-02).  Since 22 employees were terminated on January 29, 2016, (Trial Tr. at 194-95), and 5 were not (Mabie, Gray, Dash, Gonzalez and Tate), (Trial Tr. at 101, 467), approximately 33 employees did not return to the Rock Tavern terminal after the FMCSA shutdown on December 28, 2015 or left before the terminal's permanent closure.

assistance and introduce Spencer to Anagnost as a possible source of financial help for Land-Air. (Trial Ex. 261 ¶¶ 11-12; Trial Ex. 241 at 29).  Thereafter, on January 12, 2016, Spencer met with Anagnost in his capacity as owner of Anagnost Investments. (Trial Ex. 261 ¶ 14).  The next day, January 13, 2016, Land-Air and Anagnost Investments executed the Loan Agreement. (*Id.*; Trial Tr. at 532).  Under the Loan Agreement, Anagnost Investments received an option to purchase a 60 percent equity interest in Land-Air. (Trial Tr. at 418; Trial Ex. 261 ¶ 15).  Anagnost Investments never exercised its option. (Trial Tr. at 419).  The Loan Agreement also provided that Land-Air's board of directors was to be comprised of five directors, three of whom would be appointed by Anagnost Investments and two of whom would be appointed by the Spencers. (*Id.* at 533).  Land-Air also agreed to appoint Anagnost as treasurer of Land-Air, and to convey financial control of the company to him. (*Id.* at 533-34).  Ultimately, Anagnost never acted as treasurer, nor did he sit on Land-Air's board of directors or appoint anyone to Land-Air's board. (*Id.* at 419-20).

After the Loan Agreement was executed, and in the days leading up to the Rock Tavern terminal's closure, Defendants were involved in many of Land-Air's operational tasks and public relations. (*Id.* at 349-51, 354, 456, 486, 550-51, 611-12).  For example, on January 21, 2016, Land-Air and NEF issued a press release announcing a "joint partnership" and "recent alignment" between the two companies. (*Id.* at 303; Trial Ex. 201).  In addition, in January 2016, Palker, Baroody and Anagnost were involved in drafting lease cancelations for the Rock Tavern terminal, (Trial Tr. at 568-69, 638-39), and communicating with vendors and creditors on Land-Air's behalf, (*id.* at 484-85, 557, 610-11; Trial Exs. 264, 270).  Palker helped change Land-Air's terminal manager's e-mail addresses to NEF e-mail addresses, (Trial Tr. at 163; Trial Ex. 256 ¶ 27), and Defendants assisted with the liquidation of some of Land-Air's assets, (Trial Tr. at 456).

Spencer testified that Palker, Anagnost and Baroody were assisting him with the "dirty cleanup" work necessary to keep Land-Air afloat after the FMCSA shutdown. (*Id.* at 351).

In or around May 8, 2016, Land-Air entered into an asset purchase agreement ("APA") with NEF. (*Id.* at 431; Trial Ex. L).  Pursuant to the APA, NEF assumed Land-Air's secured debt in exchange for the right to some of Land-Air's assets. (Trial Tr. at 432)  NEF did not acquire any Land-Air stock under the APA. (*See* Trial Ex. L).  While Land-Air continued to exist as a corporate entity, (Trial Tr. at 619), it ceased operating as an independent trucking company following the execution of the APA, (*id.* at 617).  After the APA was executed, Spencer and his brother were employed by LAX as consultants. (*Id.* at 381).  The Spencers did not acquire equity in NEF or LAX. (*Id.* at 300, 384).

## III.  CONCLUSIONS OF LAW

### A.  WARN Acts

#### 1.  Federal WARN Act

Under the federal WARN Act, "an employer with 100 or more employees must, sixty days in advance of a plant closing or mass layoff, provide written notice to each affected employee or their representative, as well as the state." *In re Great Atl. & Pac. Tea Co., Inc.*, 467 B.R. 44, 53 (S.D.N.Y. 2012), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.*, 508 F. App'x 63 (2d Cir. 2013) (citing 29 U.S.C. § 2102(a)).  If an employer who orders a plant closing fails to give the requisite notice to its employees, it is liable to each affected employee for back-pay and benefits for the period of violation. 29 U.S.C. § 2104(a)(1).

#### 2.  New York WARN Act

"The New York WARN Act . . . largely mirrors the federal WARN Act, but says that 'employer' includes all employers that employ more than 50 full-time employees, as opposed to

100." *Gill v. ACACIA Network*, No. 13 Civ. 9088(TPG), 2015 WL 1254774, at *3 (S.D.N.Y. Mar. 18, 2015) (citing N.Y. LAB. L. § 860-a(3)).  "The New York WARN Act also contains stricter notice requirements, requiring an employer to give 90 days' notice before termination, as opposed to 60." *Id.*  "Given these stricter requirements, wherever there is liability under the federal WARN Act, there is necessarily liability under the N.Y. WARN Act." *1199 SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council, Inc.*, No. 13 Civ. 2768(JGK)(JCF), 2013 WL 6003731, at *2 (S.D.N.Y. Nov. 13, 2013), *report and recommendation adopted*, 2013 WL 6244716 (S.D.N.Y. Dec. 3, 2013).  The purpose of the federal WARN Act and its state analogs is to "provide[] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1.

 **B. Issues Before the Court**

       The Court must decide: (1) whether the requisite number of employees suffered an employment loss due to the Rock Tavern terminal's closure to trigger the WARN Acts' notice requirements, and (2) if the closure of the Rock Tavern terminal triggered either WARN Act, whether Defendants are liable under a theory of successor liability.  For the reasons that follow, the Court finds that Plaintiffs have failed to sustain their burden of establishing numerosity under the WARN Acts, and therefore, notice requirements were not triggered.  The Court further finds that even if Plaintiffs established numerosity, Defendants would not be liable as successor entities of Land-Air.

## 1.  WARN Acts' Numerosity Requirement

"The first step in determining whether a plant closing under WARN has occurred is to establish whether the requisite number of employees suffered an employment loss at a single site of employment." *1199 SEIU United Healthcare Workers E.*, 2013 WL 6003731, at *2.  Under the federal WARN Act, a "plant closing" occurs when a shutdown of a single site leads to the loss of employment for at least 50 employees "during any 30-day period." 29 U.S.C. § 2101(a)(2); *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013).  The New York WARN Act has a lower threshold, defining a "plant closing" as the termination of at least 25 employees during a 30-day period at a single site of employment. N.Y. LAB. L. § 860-a(6). The plaintiff bears the burden of proving that a "plant closure" occurred. *See, e.g.*, *Assif v. Titleserv, Inc.*, CV 11-3203 (PKC) (AKT), 2014 WL 12843780, at *6 (E.D.N.Y. Aug. 25, 2014).

It is undisputed that there were approximately 60 employees (including Mabie and the mileage drivers) working at the Rock Tavern terminal in December 2015. (*See, e.g.*, Trial Tr. at 202).  Plaintiffs maintain that the WARN Acts' numerosity requirements are satisfied.  First, they contend that the employees who did not return to work after the FMCSA shutdown count toward numerosity because they left due to worries about not being paid or the future of Land-Air, and thus did not leave "voluntarily." (Docket No. 245 at 10-11).  In support of their contention, Plaintiffs rely on testimony and payroll records showing that certain employees missed multiple payrolls for work performed during the FMCSA shutdown. (*See, e.g.*, Trial Tr. at 83; Trial Exs. 256 ¶¶ 8, 12, 255 ¶ 9).

Second, Plaintiffs assert that even if the employees who left the Rock Tavern terminal because they were concerned about not being paid do not count toward numerosity, there were still enough employees terminated within any 30-day period to trigger notice requirements.

(Docket No. 245 at 13).  Specifically, Plaintiffs aver that at least 39 employees did not return to work, or were not paid for work, between the initial closure of the Rock Tavern terminal on December 28, 2015 and its reopening on January 8, 2016. (*Id.* at 13-15).  In support of their argument, Plaintiffs principally rely on payroll records showing that as of the week ending January 9, 2016, 16 paychecks were issued for Rock Tavern employees. (*Id.* at 13; Trial Ex. J (adding columns "10-NBG" + "10-Shop")).  Thus, Plaintiffs contend that if there were 55 employees working at Rock Tavern in December 2015 (excluding Mabie and the mileage drivers), but only 16 paychecks issued for the week ending January 9, 2016, 39 employees "did not return to work or were not paid for work between the initial closure of the terminal on December 28th and after it reopened on January 8th." (*Id.* at 13-14).  Plaintiffs thus conclude that "more than 25 employees suffered an 'employment loss' as a result of a 'plant closing' during a[ny] 30-day period," satisfying the New York WARN Act. (*Id.* at 14).

Next, Plaintiffs argue that as of the weeks ending on January 16, 2016 and January 23, 2016, there were 27 paychecks issued for Rock Tavern employees, and for the week ending January 30, 2016, there were 22 paychecks issued for Rock Tavern employees. (*Id.* (citing Trial Ex. J)).  Plaintiffs thus assert that, between January 6, 2016, when the "55+ employees" were notified of Rock Tavern's financial difficulties, and January 29, 2016, when the terminal closed, "more than 50 employees suffered an 'employment loss' as a result of a 'plant closing' during *any* 30-day period," satisfying the federal WARN Act. (*Id.*).

Finally, Plaintiffs aver that even if the Court does not find that at least 25 employees were terminated from the Rock Tavern terminal during any 30-day period, the evidence still shows that at least 25 employees were terminated from the Rock Tavern terminal when it closed on January 29, 2016. (*Id.* at 15).  Plaintiffs maintain that although various company records show

that 22 employees were terminated from Land-Air on January 29, 2016, these records do not

account for five additional employees: Mabie and the mileage drivers.  Therefore, Plaintiffs

argue that the total number of employees terminated by Land-Air on January 29, 2016 was 27.

(*Id.* at 14-15).

Defendants counter that while it is undisputed that Land-Air terminated 22 employees on

January 29, 2016, Plaintiffs fail to establish that at least 25 employees suffered an employment

loss under the WARN Acts for two reasons. (*See generally* Docket No. 246).  First, Defendants

argue that the Court cannot consider the 33 (or 39 as Plaintiffs contend) employees who did not

return to work following the FMCSA shutdown or who left the Rock Tavern terminal prior to

Land-Air's permanent closure on January 29, 2016. (*Id.* at 9-16).  Defendants contend that

because Plaintiffs offered no evidence of constructive discharge, the departures of these 33

employees are presumed to be voluntary, and therefore, should not count toward numerosity.

(*Id.*).

Second, Defendants argue that Plaintiffs failed to show that at least 25 employees were

terminated on January 29, 2016. (*Id.* at 16-22).  Specifically, they assert that the Court cannot

consider two "part-time employees," Mr. Barreto and Mr. Moore, because they worked for Land-

Air for less than six months before the shutdown, and therefore, are not "full-time employees"

under WARN. (*Id.* at 16-17).  Defendants further contend that the mileage drivers do not count

toward the numerosity requirement because the Rock Tavern terminal was not their "single site

of employment." (*Id.* at 18-20).  Finally, Defendants maintain that Rock Tavern employees who

continued their employment with Land-Air after the closure of the Rock Tavern terminal,

including Mabie and Dash, do not count toward the numerosity calculation. (*Id.* at 20-22).

To trigger the WARN Acts, Plaintiffs must show that a "plant closing" occurred, requiring a finding that at least 25 (or 50) Rock Tavern employees suffered an "employment loss," defined as an "employment termination" excluding "discharge for cause, *voluntary departure*, or retirement." 29 U.S.C. § 2101; N.Y. LAB. L. § 860-a(2) (emphasis added).  The parties dispute the meaning of "voluntary" under the WARN Acts.  Plaintiffs maintain that at least 39 employees "did not return to work or were not paid between the initial closure of the terminal on December 28th and after it reopened on January 8th," and thus, more than 25 employees suffered an "employment loss" as a result of a "plant closing" during any 30-day period. (Docket No. 245 at 13-14).  In support of their argument, Plaintiffs urge the Court to apply the meaning of "voluntary departure" set forth in *Collins v. Gee West Seattle LLC*, which held that "an employee departing a business because that business was closing, has not 'voluntarily departed' within the meaning of the [WARN] Act." 631 F.3d 1001, 1008 (9th Cir. 2011).  Defendants argue, however, that the Court should instead defer to the interpretation provided by the Department of Labor ("DOL"), which provides that "a worker who, after the announcement of a plant closing or mass layoff, decides to leave early has not necessarily been constructively discharged or quit 'involuntarily.'" Worker Adjustment Retraining and Notification, 54 Fed. Reg. 16,042, 16,048 (Apr. 20, 1989).  The Court defers to the DOL's interpretation of "voluntary departure" since it is an agency's reasonable interpretation of an ambiguous statute that it has administered. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

The DOL instructs that "the regulations [implementing WARN] do not attempt to specifically define the parameters of voluntariness, but merely refer to" the "developed body of [federal] law" discussing voluntary departures. Worker Adjustment Retraining and Notification,

54 Fed. Reg at 16,048.  "This body of law recognizes the concept of constructive discharge, under which a worker's resignation . . . may be found not to be voluntary if the employer has created a hostile or intolerable work environment or has applied other forms of pressure or coercion which forced the employee to quit or resign." *Id.*  There is no evidence that any employee was subject to an intolerable working environment, or faced undue coercion causing their departure from the Rock Tavern terminal.  Further, a delay in compensation is insufficient to establish a constructive discharge. *See, e.g.*, *Castro v. City of New York*, 24 F. Supp. 3d 250, 266 (E.D.N.Y. 2014).  Thus, the Court finds that employees who departed before the January 29, 2016 shutdown left voluntarily within the meaning of the WARN Acts.

The Court further finds that the numerosity requirement is not satisfied under the analysis articulated in *Collins*.  The *Collins* Court found that "if an employee leaves a job *because the business is closing*, that employee has not 'voluntarily departed' within the meaning of the WARN Acts." *Collins*, 631 F.3d at 1002-03 (emphasis added).  For an employee to have departed *because* a business is closing, it follows that the departing employee must have known to a degree of certainty that the business was in fact closing. *See id.*  In *Collins*, the defendant-employer informed its employees via a written memorandum on September 26, 2007 that "although it was 'actively pursuing' the sale of the business it would 'be closing its doors at the end of business on Sunday October 7, 2007.'  In the event a buyer was not found before October 7, 2007, [the employer] would terminate all employees . . ." *Id.* at 1003.  By October 5, 2007, 80 percent of the company's workforce had left to find other employment. *Id.*  Documents created by the employer demonstrated that "every employee []who was terminated after September 26, 2007[,] left because the 'business closed.'" *Id.*  The court found that employees who leave "for reasons unrelated to the shutdown" leave voluntarily and do not count for purposes of

numerosity. *Id.* at 1006.  By contrast, departures *because of* a business shutdown are "generally . . . a consequence of the shutdown and must be considered a loss of employment . . ." *Id.*  In other words, "unless there is some evidence of imminent departure for reasons other than the shutdown . . . it is unreasonable to conclude that employees voluntarily departed after receiving notice of the upcoming closure." *Id.*

The instant case is distinguishable from *Collins*.  The employees who left the Rock Tavern terminal before January 25, 2016, when Spencer decided to close the terminal, did not know of the upcoming closure and therefore could not have left because of the closure. (*See* Trial Tr. at 389-90, 405).  Spencer credibly testified that he did not decide to close the Rock Tavern terminal until approximately January 25, 2016, after the terminal lost its second largest customer, Pitt Ohio Express. (*Id.*).  Thus, any employee who left before January 25, 2016, could not have left because of the shutdown because Spencer intended to keep the Rock Tavern terminal operating until he changed his mind on January 25, 2016. (*See id.* at 349-50, 389-90, 405). Further, the evidence shows that the Rock Tavern employees received notice of the closure *on* January 29, 2016. (*Id.* at 277-78; Trial Exs. 257 ¶ 10, 258 ¶ 10, 259 ¶ 11, 260 ¶ 8).  Mabie was specifically instructed not to inform any employees of the upcoming closure until the day of the shutdown. (Trial Ex. 256 ¶ 20).

Additionally, there is no evidence in the record regarding which, if any, Rock Tavern employees departed between January 25, 2016 — when Spencer decided to close the terminal — and January 29, 2016 — when the terminal closed.  In fact, Mabie, the only Rock Tavern employee that the record indicates was told about the impending closure, remained employed by Land-Air until May 2016. (Trial Tr. at 467).  If any employees did leave between January 25 and 29, 2016, the Court cannot speculate as to their motivations for doing so.  Thus, the *Collins*

analysis in inapplicable, as the employees who left between the FMCSA closure and the permanent shutdown did not depart the Rock Tavern terminal after receiving notice of an impending closure. *See Collins*, 631 F.3d at 1006.  The Court therefore concludes that these employees left voluntarily.

The evidence also does not establish that at least 25 employees were terminated on January 29, 2016.  Land-Air's payroll records show that 22 paychecks were issued to employees for the week ending January 30, 2016. (*See* Trial Ex. J).  Further, Mabie testified that on the day of the shutdown 22 employees were terminated. (Trial Tr. 194-95).  Plaintiffs argue that because these records do not account for Mabie and the mileage drivers, there were in fact 27 employees working at the Rock Tavern terminal on January 29, 2016.  This argument fails.

First, the evidence does not support a finding that the mileage drivers count toward numerosity.  The DOL provides guidance on determining the single site of employment for workers like mileage drivers: "workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites." 20 C.F.R. § 639.3(i)(6).  There are three, alternative criteria to establish a "single site of employment" for such employees: "(1) the site to which employees were assigned as their home base; (2) the site from which their work is assigned, or (3) the site to which the employees report." *In re Glob. Aviation Holdings, Inc.*, 483 B.R. 54, 59 (Bankr. E.D.N.Y. 2012).  Any one of these alternatives may be used to establish a single site of employment. *Id.*

Furthermore, "to establish a 'home base' under the WARN Acts, a plaintiff must at the very least be able to show a physical connection between the employee and the location in question." *Id.* at 62.  "While the precise level of connection necessary to establish a 'home base'

may vary from case to case," a "notional base," used to calculate employee's commuting compensation and required time-off is not a home base "in any reasonable sense of the term." *Id.*; *see also Bader v. N. Line Layers, Inc.,* 503 F.3d 813, 819-20 (9th Cir. 2007) ("[A]n employee's home base is the place from which [they] leave[] at the start of the work period and/or return[] to at the end of the work period, or at the very least, where [they] [are] physically present at some point during a typical work period.").

Plaintiffs failed to establish that the Rock Tavern terminal served as the mileage drivers' single site of employment.  Three mileage drivers, Dash, Gonzalez and Tate, were "moved over" and "worked out of" the Rock Tavern terminal in January 2016 after the Burlington, New Jersey terminal closed. (Trial Ex. 254 ¶ 25 n.1).  Gray worked under the Rock Tavern "heading" during his employ at Land-Air. (Trial Tr. at 61).  Nonetheless, Land-Air's mileage drivers did not work primarily at a single terminal.  They were "over-the-road drivers" who "would sleep in the cab of their truck" because "They had sleeper berths in their trucks.  They . . . pretty much lived in there, in their truck, during the week.  And they got paid by mileage only." (*Id.* at 60-61).  Further, the mileage drivers neither received assignments from, nor reported to, anyone at the Rock Tavern terminal. (*Id.* at 414).  Spencer testified that the mileage drivers "reported to a dispatcher out of Boston" and received their direction from their "dispatcher in Boston." (*Id.*).  In other words, they were not "domiciled" out of, or "assigned to," any facility. (*Id.* at 409-10, 414, 478).  Therefore, the evidence does not establish that the mileage drivers had a physical connection to the Rock Tavern terminal sufficient to render it their "home base," nor does it establish that the mileage drivers reported to, or were assigned work from the Rock Tavern terminal. *See In re Glob. Aviation Holdings, Inc.*, 483 B.R. at 62.

Plaintiffs have also failed to establish that Mabie or Dash suffered an "employment loss" under the WARN Acts. An "employment loss" means the "permanent cessation of the employment relationship." *Morton v. Vanderbilt Univ.*, 809 F.3d 294, 296 (6th Cir. 2016) (quoting Worker Adjustment Retraining and Notification, 54 Fed. Reg. at 16,047). To assess whether WARN's notice requirements were triggered, courts should apply a "practical, effects-driven analysis of whether a break in employment actually occurred." *Gonzalez v. AMR Servs. Corp.*, 68 F.3d 1529, 1531 (2d Cir. 1995) (quoting *Martin v. AMR Servs. Corp.*, 877 F. Supp. 108, 113 (E.D.N.Y. 1995)). Under WARN, "an employee may not be considered to have experienced an employment loss if the employer, 'prior to the closing or layoff,' offers to transfer the employee to another employment site." *Moore v. Warehouse Club*, 992 F.2d 27, 30 (3d Cir. 1993) (citing 29 U.S.C. § 2101(b)(2)); *Gonzalez*, 68 F.3d at 1531 (finding that 18 employees did not suffer an "employment loss" under the WARN Acts where they were transferred to different positions within the company and there was no break in service); *cf Long v. Dunlop Sports Grp. Ams., Inc.*, 506 F.3d 299, 303 (4th Cir. 2007) (holding that DOL regulations expressly provide that a "'termination' does not occur simply because an employee no longer performs the work that the employee formerly performed.").

Here, neither Mabie nor Dash experienced a permanent cessation in their employment at Land-Air when the Rock Tavern terminal closed. Both employees continued to work for Land-Air after January 29, 2016. Dash continued to work at Land-Air through the execution of the APA, in May 2016. (Trial Tr. at 417). Mabie also continued to work at Land-Air until May 2016. (*Id.* at 467). Thus, neither Mabie nor the mileage drivers suffered an "employment loss" resulting from the closure of the Rock Tavern terminal because neither experienced a cessation in their employment. Although Mabie returned to her prior role of partner relations manager,

which she characterized as a demotion, (Trial Ex. 256 ¶ 34), this does not amount to a

termination. *See Int'l All. of Theatrical and Stage Emps. and Moving Picture Mach. Operators,*

*AFL-CIO v. Compact Video Servs., Inc.*, 50 F.3d 1464, 1468-69 (9th Cir. 1995) (because

Congress expressly "applied WARN notice requirements to reductions in work hours," it follows

that "WARN does not apply to any other modifications of the terms of employment." As such,

employees whose "pay and benefits [were] cut" did not suffer an "employment loss" under

WARN).

Finally, the evidence establishes that at least two employees that were terminated on

January 29, 2016, Barreto and Moore, do not count toward numerosity because they were "part-

time" employees under WARN. To determine whether plant closing, or mass layoff thresholds

are reached, "WARN does not require employers to include 'part-time' employees in the count

of employees affected." *Guippone*, 737 F.3d at 225 n.3. An employee is considered "part-time"

if they were employed for (1) an average of fewer than 20 hours per week, or (2) fewer than six

of the twelve months preceding the date on which notice is required. 29 U.S.C. § 2101(a)(8);

N.Y. LAB. L. § 860-a(5) (identically defining and excluding "part-time" employees from

numerosity count).

Because the Rock Tavern terminal closed on January 29, 2016, the date on which notice

would have been required under the federal WARN Act was November 30, 2015 (60 days prior).

Under the New York WARN Act, notice would have been required on October 31, 2015 (90

days prior). The evidence shows that Barreto and Moore were hired after June 1, 2015. (*See*

Trial Ex. M at 2-3). Thus, they were employed for fewer than six of the twelve months

preceding either date on which notice would have been required — October 31, 2015 or

November 30, 2015. Therefore, Barreto and Moore are considered "part-time" employees, and

are excluded from the numerosity calculation. *See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Sherman Lumber Co.*, No. Civ. 00-57-B, 2000 WL 1029223, at *3 (D. Me. July 11, 2000) ("[T]he plain language of the [WARN Act] and [its] regulation includes newly hired full-time employees that worked less than six months of the previous twelve months from the notice date within the term 'part-time employee.'").

In conclusion, the evidence does not establish that Land-Air terminated at least 25 employees on January 29, 2016, or that at least 25 employees suffered an employment loss because of the Rock Tavern terminal's closure during any 30-day period.  Accordingly, Plaintiffs have failed to satisfy their burden of demonstrating that the requisite number of employees suffered an "employment loss" to trigger the WARN Acts' notice requirements.

**2. Successor Liability**

Even if Plaintiffs demonstrated Land-Air's liability under the WARN Acts, they still failed to show that Defendants would be liable under a theory of successor liability to Land-Air. Plaintiffs argue that in light of the default judgment against Land-Air, WARN Act liability is not at issue, and thus, the Court should apply state law principles of successor liability. (Docket No. 245 at 17).  However, the Court's finding after trial that the WARN Acts' notice requirements were not triggered, *see supra*, Section III(B)(1), is inconsistent with the default judgment against Land-Air, and accordingly, the Court reports and recommends vacatur of the default judgment, *see infra*, Section IV.  Consequently, the Court will apply the DOL factors to determine whether Land-Air and the Defendants acted as a single employer with respect to the decision to close the Rock Tavern terminal.  The Court will also address Plaintiffs' argument that Defendants are liable for the default judgment against Land-Air under state law successor liability principles, (Docket No. at 16-26), in the event that the Honorable Vincent L. Briccetti disagrees with the

Court's report and recommendation that the default judgment against Land-Air should be vacated.

### i. DOL Factors

The Second Circuit expressly adopted the DOL's non-exclusive five-factor test to determine whether related entities are "single employers" under the WARN Act. *Guippone*, 737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)) ("[T]he DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind and focus particularly on circumstances relevant to labor relations.") (internal quotations omitted). Under the DOL regulations, an "employer" may encompass a parent company's subsidiaries "depending upon [the subsidiary's] degree of independence from the parent." 20 C.F.R. § 639.3(a)(2). Courts in this district since *Guippone* have analyzed whether related entities, outside of the parent-subsidiary context, are a "single employer" using the DOL factors. *See, e.g.*, *Gill*, 2015 WL 1254774, at *3-4 (applying the DOL factors to a corporation characterized as a "successor employer"); *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 375 (S.D.N.Y. 2017); *In re MF Glob. Holdings, Ltd.*, No. 13 Civ. 07218(LGS), 2014 WL 4054281, at *6 (S.D.N.Y. Aug. 14, 2014).

To determine an entity's degree of independence, courts consider the following factors: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." *Guippone*, 737 F.3d at 226 (quoting 20 C.F.R. § 639.3(a)(2)). Application of the DOL factors is a balancing test: no one factor is controlling, and all factors need not be present for liability to attach. *Id*; *see also Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 142 (S.D.N.Y. 2004). The factors are not weighed equally and the first two factors, common

ownership and common management, are given less weight than the last three, de facto control, unity of policies and dependency of operations. *See In re APA Transp. Corp.*, 541 F.3d 233, 243 (3d Cir. 2008).  A finding of common ownership and common management alone is not a sufficient basis to establish liability. *Id.*

"These factors are useful for courts in determining 'whether the nominally separate corporations actually functioned as a single entity with respect to [policy].'" *Guippone*, 737 F.3d at 226 (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 503-04 (3d Cir. 2001) (alterations in original)).  In a WARN Act case, the relevant "policy" is the decision to terminate the employment of a significant part of a company's work force. *Id*; *accord Vogt*, 318 F. Supp. 2d at 142.  Thus, assuming, *arguendo*, that Plaintiffs established WARN Act liability, the central question for the Court is whether Land-Air and Defendants acted as a single entity in deciding to close the Rock Tavern terminal on January 29, 2016. *See Guippone*, 737 F.3d at 226.

### a.  Common Ownership

The common ownership factor weighs against a finding of liability.  This factor asks "whether a parent or related entity directly owns a separate corporate entity." *Garner*, 260 F. Supp. 3d at 377.  Ownership must be direct and cannot be held through other investment companies. *See Vogt*, 318 F. Supp. 2d at 142 (finding common ownership only for the three "investment vehicles" that actually owned stock in the allegedly culpable entity, but not for the other parties that were "at best grandparents" of the entity).  This factor is of limited importance because "stock ownership alone is not grounds for holding a parent liable for its subsidiary's actions." *Id.* (citing *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998)).  As such, the common ownership factor "is typically referred to as the 'least important' of the factors." *See, e.g.*, *Pearson*, 247 F.3d at 494 (quoting *Int'l Bhd. of Teamsters Local 952 v. Am. Delivery Serv.*, 50 F.3d 770, 775 (9th Cir. 1995)).

In any event, Defendants did not have a direct ownership interest in Land-Air in January

2016.  Additionally, in January 2016, neither Anagnost Investments nor Anagnost had a direct

ownership interest in Land-Air.[9]  Although Anagnost Investments was granted an option to

purchase 60 percent of Land-Air's stock pursuant to the Loan Agreement, (Trial Tr. at 539; Trial

Ex. F), Anagnost Investments never exercised its option, (Trial Tr. at 593).  Further, Anagnost

never held a direct ownership interest in Land-Air and was not a creditor of Land-Air until April

2016. (*Id.* at 568).

## b. Common Directors and Officers

The common directors and officers factor "looks to whether the two nominally separate

corporations . . . (1) actually have the same people occupying officer or director positions with

both companies; (2) repeatedly transfer management-level personnel between the companies; or

(3) have officers and directors of one company occupying some sort of formal management

position with respect to the second company." *Garner*, 260 F. Supp. 3d at 377.  This factor, like

the first factor, is of limited importance. *Id.*; *accord Bestfoods*, 524 U.S. at 69-70 ("[I]t is entirely

appropriate for directors of a parent corporation to serve as directors of its subsidiary. . . . Since

courts generally presume that the directors are wearing their 'subsidiary hats' and not their

'parent hats' when acting for the subsidiary, it cannot be enough to establish liability . . . that

dual officers and directors made policy decisions and supervised activities at the [subsidiary].")

Nonetheless, this factor weighs against a finding of liability.  The record does not establish that

Land-Air and the Defendants shared common officers or directors in January 2016.  Although

---

[9] The Court notes that neither Anagnost Investments nor Dick Anagnost are named defendants in this action.  Even if Plaintiffs demonstrated that Anagnost Investments or Anagnost had a direct interest in Land-Air in January 2016 (which they did not), such a showing does not support the conclusion that *the Defendants* had a direct interest in Land-Air during the relevant time-period, such that common ownership is established between the Defendants and Land-Air.  Further, the fact that Anagnost Investments and NEF have a mutual owner, Anagnost, is insufficient to establish that the Defendants would have directly owned Land-Air had Anagnost Investments exercised its option.

the Loan Agreement named Anagnost as Land-Air's treasurer and granted him authority to

reorganize Land-Air's board of directors, (Trial Ex. D), the evidence shows that Anagnost never

acted as Land-Air's treasurer, (Trial Tr. at 419-20, 594), nor did he sit on Land-Air's board of

directors or take any action to reorganize the board or appoint new members, (*id.* at 419-20).

Moreover, Anagnost entered into this loan agreement as owner of Anagnost Investments, not in

his role as co-owner of NEF. (*See* Trial Ex. D).

Plaintiffs point to Anagnost's signature as "treasurer" on a forbearance agreement

between Land-Air and a major creditor, Mid-Cap, dated April 2016. (*See* Trial Ex. 218).

However, this evidence has little probative value since the agreement was executed three months

after the Rock Tavern terminal's closure. (*See id.*).  It does not prove that Anagnost acted as

Land-Air's treasurer when Land-Air closed the Rock Tavern terminal in January 2016. *See*

*Guippone*, 737 F.3d at 227 (finding that defendants were required to operate as a "single

employer" at the time of the "employment practice giving rise to the litigation" for liability to

attach).  Moreover, the Court credits Anagnost's testimony that the forbearance agreement was

prepared by Mid-Cap, and that he specifically told Mid-Cap that any reference to him as

"treasurer" was inaccurate. (Trial Tr. at 594).  Finally, although various press releases and

documents referred to Palker as "President" and Spencer as "Co-President," (*see, e.g.*, Trial Exs.

201, 211, 229), the record is not clear regarding when these documents were executed, (Trial Tr.

at 313-16).  Consequently, this evidence is not, on its own, sufficient to find that the two entities

shared directors and officers at the time the Rock Tavern terminal closed.  Accordingly, the

second DOL factor weighs against a finding of liability.

**c.  Unity of Personnel Policies**

The unity of personnel policies factor "is analogous to the aspect in the federal labor law

test concerning 'centralized control of labor operations,' which the Second Circuit has found to

include factors such as centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining." *Vogt*, 318 F. Supp. 2d at 142-43 (citing *Clinton's Ditch Coop. Co., Inc. v. NLRB*, 778 F.2d 132, 138-39 (2d Cir. 1985)). This factor focuses specifically on "day-to-day employment policies." *Id.*  Under WARN, "the decision to effect a [plant closing] is the *single most important . . . policy*." *Id.* (emphasis added). The Court finds that Plaintiffs did not establish a unity of personnel policies between Land-Air and Defendants with respect to the decision to close the Rock Tavern terminal.

Plaintiffs point to a "combined" Land-Air and NEF employee handbook as evidence of integrated personnel policies. (*See* Trial Ex. 269).  Plaintiffs assert that this handbook sets forth the policies of both companies and identifies Palker and Spencer as "co-presidents" of Land-Air. (*See* Docket No. 245 at 30; Trial Tr. at 329; Trial Ex. 269).  However, the handbook holds little weight because it is dated April 30, 2016 — several months after the Rock Tavern terminal closed. (*See* Trial Ex. 269).  Plaintiffs also point to evidence that Palker converted Land-Air terminal managers' e-mail addresses into NEF e-mail addresses prior to the closure of Rock Tavern. (Docket No. 245 at 30-31; Trial Tr. at 162-63; *see also* Trial Ex. 256 ¶ 27).  Although such evidence supports Plaintiffs' arguments, it is not sufficient to prove unity of personnel policies, especially since there is no evidence in the record that these employees actively used the new e-mail addresses. (*See* Trial Tr. at 42).  Further, there is evidence that many Land-Air employees were not given NEF e-mail address in January 2016, and that Land-Air's e-mail accounts remained operational. (*Id.*).

Moreover, Plaintiffs failed to demonstrate centralized hiring or payment practices between Land-Air and Defendants.  There is no evidence that the two companies acted as a single entity in their payment of wages or the hiring and firing of employees. (*See id.* at 433;

Trial Exs. 161-164).  Although Palker hired Land-Air's mileage drivers as NEF employees in

January 2016, (Trial Ex. 153), this followed Spencer's independent decision to close Land-Air's

truckload division in early January to cut costs, (Trial Tr. at 414).  Further, Plaintiffs did not

present material evidence that Land-Air and Defendants' personnel records were jointly

maintained, nor did they present evidence of joint employee benefits or collective bargaining

policies.  Plaintiffs point to evidence showing Defendants' involvement with Land-Air's

operations prior to the execution of the APA, such as receiving invoices, communicating with

vendors and handling parts orders between January and May 2016. (Docket No. 245 at 31; *see,*

*e.g.*, Trial Tr. at 485).  Anagnost, Baroody and Palker credibly testified, however, that NEF was

conducting due diligence into Land-Air as a potential investment, and their involvement with

these operations was part of the due diligence process and/or an effort to stabilize Land-Air. (*See*

Trial Tr. at 544-45, 557, 733-34; Trial Ex. 241 at 25).

The Court finds that the evidence presented does not show that Defendants were involved

in Land-Air's decision to close the Rock Tavern terminal. *See Vogt*, 318 F. Supp. 2d at 142-43.

The Court credits Spencer's testimony that in January 2016 he retained sole decision-making

authority over Land-Air, that it was his decision alone to close the Rock Tavern terminal, and

that he made this decision on or about January 25, 2016. (*See* Trial Tr. at 353, 389-90, 405).

This testimony was corroborated by several other witnesses. (*See, e.g.*, *id.* at 178, 622, 719; Trial

Ex. 241 at 51-52).  The Court further credits Spencer's testimony that he "felt very strongly that

it was [his] responsibility solely to resurrect [Land-Air] and needed no permission" to advance

that goal. (Trial Tr. at 353).  The Court therefore finds that the third DOL factor weighs against a

finding of liability.

### d.  Dependency of Operations

The dependency of operations factor asks whether the parent company "controlled the day-to-day [sic] operations" of the subsidiary. *Vogt*, 318 F. Supp. 2d at 143.  To establish this factor, Plaintiffs must prove that Defendants "had the right to direct and control the manner in which [Land-Air] undertook [its] duties." *See Pearson*, 247 F.3d at 501.  "In other words, for such an all-encompassing factor such as 'dependency of operations' — a factor, which, by its nature, looks to the daily functioning of the two companies — the plaintiffs must establish the existence of . . . a 'master-servant' agency relationship." *Id*.  In assessing whether such a relationship exists, courts look to whether the two companies shared administrative or purchasing services, interchanged employees or equipment, or commingled finances. *See Vogt*, 318 F. Supp. 2d at 143 (citing *Pearson*, 247 F.3d at 500).

While it is true that some of the day-to-day operations between Land-Air and the Defendants overlapped in January 2016, an overlap of daily operations is insufficient to establish the requisite agency relationship necessary to show dependency of operations.  As discussed, *supra*, certain Land-Air employees had their e-mail addresses changed to NEF addresses, (Trial Tr. at 162-63; Trial Ex. 256 ¶ 27), and Land-Air's mileage drivers were transitioned to NEF, (Trial Ex. 153).  Also, starting on January 25, 2016, Land-Air began using NEF accounts for "road calls, oils, lubes, and fluids," (Trial Tr. at 370), and used employees at both companies, including Melissa Adams, Land-Air's controller, and Michael Perkins, NEF's Director of Maintenance, to effectuate these policies, (*id.*; Trial Ex. 268).  Nonetheless, the evidence does not show that Defendants controlled Land-Air's operations.  Spencer credibly testified that from January 2016 to May 2016, he was "still in control of Land-Air," the company remained his, and that he only sought help from Defendants to "stop the bleeding." (Trial Tr. at 424).  Further, to the extent Palker and Baroody were involved in Land-Air's negotiations with creditors and

vendors, the evidence demonstrates that their actions were sanctioned by Spencer. (*See id.* at

351-52, 423-25, 462).  Also, the evidence does not demonstrate that Defendants controlled Land-

Air's finances in January 2016. (*See id.* at 420, 426, 463-64, 594, 600, 609-10, 725-26).  Thus,

the fourth factor weighs against a finding of liability.

### e.  De Facto Control

"De facto control is perhaps the most important prong of the DOL test." *Austen v.*

*Catterton Partners V, LP*, 709 F. Supp. 2d 168, 177 (D. Conn. 2010); *accord Garner*, 260 F.

Supp. 3d at 379.  The central question is "'whether one company was the decision-maker

responsible for the employment practice giving rise to the litigation.'" *Guippone*, 737 F.3d at 227

(quoting *In re APA Transp. Corp.*, 541 F.3d at 245).  "Thus, the de facto exercise of control

prong allows the factfinder to consider whether the parent has *specifically directed* the allegedly

illegal employment practice that forms the basis for the litigation." *Id.* (quoting *Pearson*, 247

F.3d at 491) (emphasis added).  "[B]ecause the balancing of the factors is not a mechanical

exercise, if the de facto exercise of control was particularly striking — for instance, were it

effectuated by 'disregard[ing] the separate legal personality of its subsidiary,' then liability might

be warranted even in the absence of the other factors." *Pearson*, 247 F.3d at 504 (quoting

*Esmark, Inc. v. NLRB*, 887 F.2d 739, 757 (7th Cir. 1989)).

Plaintiffs argue that de facto control is demonstrated by evidence showing that

Defendants exercised "financial control" over Land-Air's operations. (Docket No. 245 at 32-34).

In support of this assertion, Plaintiffs point to evidence that between January and May 2016,

Defendants, *inter alia*, helped liquidate some of Land-Air's assets, (Trial Ex. 265), negotiated

with Land-Air's vendors and creditors, (*see, e.g.*, Trial Tr. at 548-49, 610; Trial Exs. 218, 264,

270), changed certain Land-Air e-mail addresses to NEF e-mail addresses, (Trial Tr. at 77; Trial

Ex. 256 ¶ 27), were involved with Land-Air's parts orders, (Trial Exs. 266, 268), issued joint

press releases on behalf of NEF and Land-Air, (Trial Exs. 201, 229), communicated with certain Land-Air customers, (Trial Tr. 551), facilitated the transfer of Land-Air's mileage drivers to NEF, (*id.* at 80; Trial Ex. 153), and assisted with the cancellation of the Rock Tavern terminal's lease, (Trial Tr. 555).

While this evidence certainly demonstrates that Defendants were involved in operational tasks leading up to the closure of the Rock Tavern terminal, it does not support a finding that Defendants *specifically directed* the closure of the Rock Tavern terminal.  As discussed, *supra*, numerous witnesses corroborated Spencer's testimony that he was the sole decision-maker involved in closing the Rock Tavern terminal on January 29, 2016. (*See, e.g.*, *id.* at 178, 604-05, 628, 716).  The evidence further shows that until the APA, Defendants did not have "unfettered" access to Land-Air's finances and that Spencer retained authority over financial decision making for Land-Air leading up to the Rock Tavern terminal's closure. (*See id.* at 609-10, 612, 625).

The strongest evidence linking Defendants to the closure of the Rock Tavern terminal is their involvement in its lease cancellation. (*See id.* at 351; Trial Ex. 64).  However, the Court finds on this record that Defendants' role in the lease cancellation process was part of their effort to assist Spencer with stabilizing Land-Air so they could purchase its assets. (*See* Trial Tr. at 351-52, 720; Trial Ex. 241 at 52).

Further, evidence that Anagnost became Land-Air's "largest creditor" is of limited probative value, since Anagnost became Land-Air's largest creditor in April 2016, several months after the Rock Tavern terminal closed. (*Id.* at 568).  Additionally, although Anagnost was both an owner of NEF and the principal of Anagnost Investments at the time of the shutdown, Anagnost did not direct the closure of the Rock Tavern terminal in either of these capacities. Anagnost testified that much of his involvement in Land-Air during January 2016 and leading up

to the APA was aimed at stabilizing Land-Air or conducting due diligence into a potential

investment. (*Id.* at 545, 557).  As the Second Circuit explained in *Coppola v. Bear Stearns*, "the

dispositive question [when assessing de facto control] is whether a creditor is exercis[ing]

control over the debtor beyond that necessary to recoup some or all of which is owed, and is

operating the debtor as the *de facto* owner of an ongoing business." 499 F.3d 144, 150 (2d Cir.

2007).[10]  "[A] creditor may exercise very substantial control in an effort to stabilize a debtor

and/or seek a buyer so as to recover some or all of its loan or security without incurring WARN

liability." *Id.*; *see also Pearson*, 247 F.3d at 503 ("the 'de facto exercise of control' factor is not

intended to . . . create liability for a lender's . . . oversight of its collateral.").  However, "[w]hen

the exercise of control goes beyond that reasonably related to such a purpose and amounts to the

operation of the debtor as an ongoing business — such as when there is no specific debt-

protection scenario in mind —WARN liability may be incurred." *Id.*  Here, the evidence does not

show that Anagnost Investments exerted control over Land-Air in the days leading up to the

close of the Rock Tavern terminal that went beyond conducting due diligence and/or stabilizing

the company.  Anagnost credibly testified that given his limited knowledge and recent

introduction to Land-Air's business, he would not have had "enough knowledge to even be able

to understand why a terminal needed to be closed." (Trial Tr. at 604-05).  Additionally, the

evidence does not show that Anagnost himself was involved in the lease termination, (*id.* at 605-

607), nor does it show that Anagnost authorized the joint press release, or knew it was being

distributed, (*id.* at 614, 624-25).

---

[10] In assessing whether a lender should be liable for the WARN violation of its borrower, *Coppola* held that the appropriate inquiry is whether the lender was exercising de facto control over the creditor, rejecting application of the DOL factors. 499 F.3d at 150. *Guippone* declined to extend the test articulated by *Coppola* outside of the lender-borrower context and expressly adopted the DOL factors when assessing the liability of related entities under WARN. 737 F.3d at 226.  Nonetheless, *Coppola* remains instructive when analyzing the "de facto control" factor of the DOL test. *See id*; *see also Cleary v. Am. Capital, Ltd.*, 59 F. Supp. 3d 249, 258 (D. Mass. 2014) (applying the test articulated in *Coppola* in its analysis of the "de facto control" factor of the DOL test).

The record before the Court does not demonstrate that Defendants exercised de facto control over Land-Air in its decision to close the Rock Tavern terminal.  Accordingly, the Court finds that, even if Plaintiffs had established numerosity, they failed to carry their burden of showing that Defendants and Land-Air acted as a single entity in the decision to close the Rock Tavern terminal.

## ii.  State Law Successor Liability

The Court will briefly address Plaintiffs' arguments that Defendant is liable under state law as a successor entity of Land-Air. (Docket No. 245 at 16-26).

As a general matter, New York courts will not find successor liability where a corporation "merely purchases the assets of another corporation." *Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 93 (S.D.N.Y. 2002), *aff'd*, 352 F.3d 41 (2d Cir. 2003). However, there are four exceptions to this rule: "(1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who de facto merged with a seller; and (4) a buyer that is a mere continuation of a seller." *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 702 (2d Cir. 2009).

Plaintiffs argue that the Defendants de facto merged with Land-Air. (Docket No. 245 at 19).  To determine whether a de facto merger occurred courts look to the following factors: "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." *Douglas v. Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010).  The continuity of ownership factor is the most important of the four because "continuity of ownership is the essence of a merger," *id.*,

"and without it an exception to the traditional rule — purchase of the assets alone does not impose successor liability — cannot apply," *Gallo v. Wonderly Co.*, No. 1:12-CV-1868(LEK/RFT), 2014 WL 36628, at *12 (N.D.N.Y. Jan. 6, 2014).

Plaintiffs maintain that there is continuity of ownership for the same reasons articulated in support of their earlier arguments, citing to the various provisions of the Loan Agreement and Stock Pledge Agreement. (Docket No. 245 at 20-21; Trial Exs. D, F).  For the reasons stated *supra*, Section III.B.2.i.a-b, this argument is unpersuasive.  Anagnost never exercised his rights under the Loan Agreement to purchase equity in Land-Air; he was never appointed Treasurer, nor was he ever a board member of Land-Air.  Plaintiffs further argue that this factor is satisfied because Defendants had financial control over Land-Air. (Docket No. 245 at 21).  However, the evidence in the record does not demonstrate that Defendants had financial control over Land-Air in the days leading up to the closure of the Rock Tavern terminal. *See supra*, Section III.B.2.i.e. The Court has reviewed Plaintiffs' remaining contentions, (*see* Docket No. 245 at 22-26), and finds them without merit.

Accordingly, Plaintiffs have failed to demonstrate that Defendants are liable under a state law theory of successor liability.

## IV.  DEFAULT JUDGMENT AGAINST LAND-AIR

The Honorable Vincent L. Briccetti entered a default judgment as to Land-Air's liability on August 22, 2016 and a damages inquest was ordered. (Docket Nos. 13, 18).  In December 2016, at Plaintiffs' request, the Court adjourned the inquest so additional discovery could be obtained. (Minute Entry, December 8, 2016).  In May 2017, approximately nine months after the default judgment was entered, Plaintiffs filed an Amended Complaint adding Defendants to the action under a theory of successor liability. (Docket No. 30).  Thus, Plaintiffs' claim against

Defendants rests on the premise that Land-Air is liable for violating the WARN Acts.  However, that presupposition is inconsistent with the Court's findings after the bench trial.  *See supra,* Section III.  Consequently, the default judgment presents an "incongruity" with the factual findings made at the bench trial and, therefore, is "unauthorized by law." *Frow v. De La Vega*, 82 U.S. 552, 554 (1872).  Thus, the Court respectfully reports and recommends to the Honorable Vincent L. Briccetti that the default judgment should be vacated.[11] *See id*.

The propriety of a default judgment in a multi-defendant case where such judgment is inconsistent with facts proved at trial was first addressed in *Frow v. De La Vega*. 82 U.S. at 554. In *Frow*, the plaintiff alleged that eight defendants jointly conspired to defraud him out of real property. *Id.* at 554.  One of the alleged joint-tortfeasors, Frow, failed to file a timely response resulting in a pretrial default judgment against him. *Id*.  The case went to trial and the court found in favor of the answering defendants, dismissing the complaint. *Id*.  Frow appealed the default judgment against him. *Id*.  The Supreme Court vacated the default judgment because of the "absurdity" caused by the inconsistent rulings.  Justice Bradley explained:

> If the court in such a case as this can lawfully make a final decree against one
> defendant separately, on the merits, while the cause was proceeding undetermined
> against the other, then this absurdity might follow: there might be one decree of
> the court sustaining the charge of joint fraud committed by the defendants; and
> another decree disaffirming the said charge[.] . . . [S]uch an incongruity, it seems
> did actually occur in this case. Such a state of things is unseemly and absurd, as
> well as unauthorized by law. . . . [I]f the suit should be decided against the
> complainant on the merits, the bill will be dismissed as to all the defendants

---

[11] Where a default judgment is non-final, a district court may vacate the judgment *sua sponte*. *Beom Su Lee v. Karoke City*, 18 Civ. 3895, 2020 WL 2036706(PAE)(SDA), at *1 (S.D.N.Y. Apr. 28, 2020).  Further, when a damages inquest has yet to be completed, an order, even when styled as a default judgment, is a non-final order. *Swarna v. Al-Awadi*, 622 F.3d 123, 140 (2d Cir. 2010); *accord Beom Su Lee*, 2020 WL 2036706, at *2 ("A district court may *sua sponte* — absent any motion from the parties — revisit an award of a default judgment as to liability when a damages inquest has yet to be completed, as is the case here.").  "Such an order, which 'does not end the action,' could be altered by the district court 'at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'" *Hood v. Ascent Med. Corp.*, 691 F. App'x 8, 9 (2d Cir. 2017) (quoting Fed. R. Civ. P. 54(b)).  The default judgment against Land-Air is not final since the issue of damages remains outstanding.  Accordingly, it may be vacated by the district court *sua sponte*.

> alike—the defaulter as well as the others. If it be decided in the complainant's
> favor, he will then be entitled to a final decree against all.

*Id*.  In the nearly 150 years following *Frow*, its holding has been interpreted narrowly.

Nonetheless, "*Frow* undoubtedly stands for the proposition that in certain circumstances it is

inappropriate to enter a default judgment against one defendant when other defendants in the

same case have prevailed." *Farzetta v. Turner & Newall, Ltd.*, 797 F.2d 151, 154 (3d Cir. 1986);

*see Hudson v. Universal Pictures Corp.*, No. 03-CV-1008 (FB)(LB), 2004 WL 1205762, at *5

(E.D.N.Y. Apr. 29, 2004); *Diarama Trading Co., Inc. v. J. Walter Thompson USA, Inc., No. 01

Civ. 2950(DAB),* 2002 WL 31545845, at *3 (S.D.N.Y. Nov. 13, 2002).

    In the Second Circuit, the *Frow* principle has been primarily applied prospectively, *i.e.*,

before liability of the litigating defendants is determined.  The preferred practice is "to postpone

decision on a default judgment until the case against the litigating defendants concludes." *Rivera

v. Limassol Grocery, Corp.*, 16-CV-6301-KAM-SJB, 2019 WL 1320339, at *2 (E.D.N.Y. Jan. 4,

2019) ("*Limassol Grocery*"); *accord Economist's Advocate, LLC v. Cognitive Arts Corp.*, No. 01

Civ. 9486 (RWS), 2004 WL 2650906, at *3 (S.D.N.Y. Nov. 22, 2004) ("[w]hen a default is

entered against one defendant in a multi-defendant case, the preferred practice is for the court to

withhold granting default judgment until the [trial] of the action on the merits against the

remaining defendants.") (quoting *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*,

378 F. Supp. 403, 416 (S.D.N.Y. 1974)).  Further, '[i]f plaintiff loses on the merits, the

complaint should be dismissed against both defaulting and non-defaulting defendants."

*Economist's Advocate*, 2004 WL 2650906, at *3 (quoting *Exquisite Form*, 378 F. Supp. at 416).

"The reason for this is plain: it might result in inconsistent judicial decrees, where a judgment is

entered against the defaulting defendant while the non-defaulting defendants are relieved from

liability after trial. *Bleecker v. Zetian Sys., Inc.*, No. 12 Civ. 2151(DLC), 2013 WL 5951162, at

\*6 (S.D.N.Y. Nov. 1, 2013).

The courts in this Circuit have applied *Frow* inconsistently.  Some courts hold that "[t]o

the extent the rule announced by *Frow* affects entry of default judgment as to one defendant prior

to a determination on the merits as to the remaining defendants, it has been limited . . . to those

instances where the liability of the defendants is joint." *Economist's Advocate*, 2004 WL

2650906, at \*4; *accord Lemache v. Tunnel Taxi Mgmt., LLC*, 354 F. Supp. 3d 149, 152-53

(E.D.N.Y. 2019).  Other courts have applied *Frow* when defendants are "merely similarly

situated," or "have closely related defenses." *Rivera v. Mattingly*, 06 Civ. 7077 (LAP)(HBP),

2017 WL 7050323, at \*7 (S.D.N.Y. June 23, 2017) (quoting 10A Charles A. Wright, Arthur R.

Miller & Mary K. Kane, Federal Practice & Procedure § 2690 ( "Wright & Miller")); *see, e.g.*,

*Diarama Trading Co.*, 2002 WL 31545845, at \*4; *Faberware v. Groben*, No. 89 Civ. 6240

(PKL), 1991 WL 123964, \*3 n.4 (S.D.N.Y. July 3, 1991).

However, courts agree that the key to applying *Frow* "is recogniz[ing] that the *Frow*

principle is designed to apply only when it is necessary that the relief against the defendants be

consistent." *Limassol Grocery*, 2019 WL 1320339, at \*4 (quoting Wright & Miller § 2690); *see*

*also Int'l Controls Corp. v. Vesco*, 535 F.2d 742, 746 n.4 (2d Cir. 1976) ("*Vesco*") ("*Frow*

controls in situations where the liability of one defendant necessarily depends upon the liability

of others.").[12]  In such cases, it would be incongruous to hold one party liable "when a court has

---

[12] *Vesco* called the continuing viability of *Frow* after the adoption of Rule 54(b) into question. 535 F.2d at 746 n.4. In a footnote, the *Vesco* Court commented that "it is most unlikely that *Frow* retains any force subsequent to the adoption of Rule 54(b). . . . [A]t most, *Frow* controls in situations where the liability of one defendant necessarily depends upon the liability of the others." *Id.*  Nonetheless, "decisions in this Circuit subsequent to *Vesco* support extension of *Frow* to cases in which defendants are merely similarly situated," or at minimum, to cases where it is necessary that relief among the defendants be consistent. *Diarama Trading Co.*, 2002 WL 31545845, at \*4; *accord Rivera*, 2017 WL 7050323, at \*7.  This view is corroborated by other circuit courts. *See, e.g.*, *Frazetta*, 797 F.2d at 154 ("we believe that *Frow* stands for the proposition that if at trial facts are proved that exonerate certain defendants and that as a matter of logic preclude the liability of another defendant, the plaintiff should be collaterally

determined that another party in essentially the same position is not." *Rivera*, 2017 WL 7050323, at *7 (quoting 10 Daniel R. Coquillette et al., *Moore's Federal Practice* § 55.36 at 55-70 (3d ed. 2017)); *accord RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 414 (S.D.N.Y. 2009) (denying motion for default judgment after complaint was dismissed for failure to state a claim since the claim against the defaulting defendant "was not based on any cognizable facts properly before the court."); *Hudson*, 2004 WL 1205762, at *5 (declining to enter a default judgment after summary judgment was granted in favor of answering defendants because such a "judgment against one defendant when claims against similarly situated co-defendants have been found to be meritless would be unseemly and absurd, as well as unauthorized by law.") (internal quotations omitted).

Here, *Frow* must be applied retrospectively as the merits of Plaintiffs' claim against Defendants have already been reached. *Economist's Advocate*, 2004 WL 2650906, at *4 ("as the merits have already been reached . . . it need not be determined whether the limitations placed on the pre-trial application of *Frow* apply."). Further, the default judgment was entered *before* Defendants NEF and LAX were added to the action. Thus, at the time the Court entered the default judgment, the Court could not have anticipated that it could result in a potential inconsistency.

When a court applies the *Frow* principle prospectively, it does so to avoid *possible* incongruences that *may* occur after the claims are fully adjudicated. But where, as is the case

---

estopped from obtaining a judgment against the latter defendant, even though it failed to participate in the proceeding in which the exculpatory facts were proved."); *In re First T.D. Inv. Inc.*, 253 F.3d 520, 532 (9th Cir. 2001) ("It would . . . be incongruous and unfair to allow the [plaintiff] to prevail against [the] Defaulting Defendants on a legal theory rejected by the . . . court with regard to the Answering Defendants in the same action."); *Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc.*, 740 F.2d 1499, 1512 (11th Cir. 1984) (vacating default judgment against defaulting defendant in breach of contract action after the jury returned a verdict for the answering defendants.).

here, a court applies *Frow* retrospectively, *i.e.*, after liability of the litigating defendants is determined, it has the benefit of knowing the final disposition of the claims before it.  It follows that in the former circumstance, courts must scrutinize the relationship between the parties to determine the likelihood that a default judgment and potential judgment on the merits will conflict before denying entry of a default judgment.  In the latter circumstance, however, a court knows with certainty the disposition of the case and must only determine whether the judgments are consistent.

In conclusion, *Frow* and its progeny dictate that the default judgment against Land-Air must be vacated.  Plaintiffs' *only* theory of liability against Defendants is that they are liable for Land-Air's violation of the WARN Acts under a theory of successor liability.  Therefore, Plaintiffs had to prove at trial that Land-Air was liable for violating the WARN Acts.  Plaintiffs failed to do so.  The Court's finding that the WARN Acts' notice requirements were not triggered is inconsistent with a judgment that Land-Air did in fact violate the WARN Acts. *See Hudson*, 2004 WL 1205762, at *5.  Such a judgment cannot stand.  Accordingly, the Court respectfully reports and recommends to the Honorable Vincent L. Briccetti that the default judgment against Land-Air be vacated.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' federal and New York WARN Acts claims are denied.  The clerk is respectfully requested to enter judgment for Defendants NEF and LAX. Defendants' motion to decertify Plaintiffs' proposed class is moot.  The Clerk is respectfully requested to terminate the pending motion (Docket No. 239).

Additionally, I conclude and respectfully recommend to the Honorable Vincent L. Briccetti that

the default judgment entered against Land-Air on August 22, 2016, (Docket No. 13), be vacated

and the action be dismissed against it.

## VI.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Opinion and Order to

serve and file written objections to the Report and Recommendation concerning vacating the

default judgment and dismissing the complaint against Land-Air. *See* Fed. R. Civ. P. 6(a) and (d)

(rules for computing time).  A party may respond to another party's objections within fourteen

(14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2).  Objections and responses

to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the

chambers of the Honorable Vincent L. Briccetti at the United States District Court, Southern

District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the

chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Vincent

L. Briccetti and not to the undersigned.  Failure to file timely objections to this Report and

Recommendation relating to vacating the default judgment will result in a waiver of objections

and will preclude later appellate review of any order of judgment that will be rendered. *See* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d

601, 604 (2d Cir. 2008).

Dated:  December 18, 2020
        White Plains, New York

SO ORDERED:

_____
JUDITH C. McCARTHY
United States Magistrate Judge